IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALLEGHENY COUPLING COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | C.A. No. 06-76 Erie |
| ) | District Judge McLaughlin |
| BETTS INDUSTRIES, INC., ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., J.

      This matter is before the Court upon a motion for summary judgment filed by Defendant Betts Industries, Inc. ("Defendant" or "Betts") against Plaintiff Allegheny Coupling Company ("Plaintiff" or "Allegheny Coupling").  For the reasons which follow, Defendant's motion for summary judgment is granted and this action is dismissed.

**I. BACKGROUND**

      Allegheny Coupling, founded in 1955, markets and sells industrial couplings and fittings. (Deposition of Raymond V. Heelan ("Heelan Depo."), p. 40).  Allegheny Coupling does not own or operate any production facilities or produce its own products. Rather, it engages various "job shops" to produce its product line, including H&H Metal Specialty, Inc. ("H&H") and Rand Machine Company ("Rand").  (Heelan Depo., p. 36).  The "Allegheny" portion of the company's name is derived from the Allegheny region of Western Pennsylvania where the company is situated. (Heelan Depo., p. 40).

1

Prior to 1997, a sister company, Allegheny Valve, marketed and sold various valve products including mechanical emergency valves, gate valves and operators for the truck tank industry. Like Allegheny Coupling, it utilized job shops such as H&H to produce component parts and products. (Heelan Depo., pp. 38-40).

Betts Industries, Inc. ("Betts") was founded in 1901 as a foundry and job shop and eventually grew to become a manufacturer of its own proprietary products for the highway cargo tank industry. (Affidavit of Rodney E. Betts, ¶¶ 3-6). Prior to 1997, Betts manufactured 3-inch and 4-inch mechanical emergency valves for Allegheny Valve. (Deposition of Richard Betts ("Betts Depo."), pp. 18-22). Design drawings for the mechanical valves were prepared and maintained by Allegheny Valve and depicted the various component parts of each of their products. Betts obtained the valve bodies necessary to manufacture the mechanical emergency valves directly from H&H.

On May 30, 1997, Betts entered into a purchase agreement with respect to Allegheny Valve's line of products.[1] (Heelan Depo., pp. 43, 53-55). Following this transaction, H&H stopped stamping the name "Allegheny" or "Allegheny Valve" upon the mechanical emergency valves that it manufactured and replaced the stamp with one that embossed the name "Betts" on the valve. (Deposition of Brian Cici ("Cici Depo."), pp. 60-61). From 1983 through approximately 2004, Betts alleges that it purchased various parts necessary for the production of its own products directly from H&H.

Allegheny Coupling specifically asserts trademark protection for the phrases "Allegheny Coupling," "Allegheny Coupling Co." and "Allegheny Coupling Company." On March 23, 2006, Allegheny Coupling filed a request with the United States Patent and Trademark Office ("USPTO") to register its mark on the USPTO's Principal Register. Registration on the Principal Register is reserved for arbitrary/fanciful or suggestive marks, or descriptive marks that have acquired secondary meaning, and constitutes prima facia evidence of the validity of a trademark and the owner's

---

[1] Although the parties dispute various details of this transaction, that dispute is not material to our resolution of the summary judgment motion.

exclusive right to use it in commerce.  See 15 U.S.C. §1057(b).  On September 7, 2006, the USPTO refused Allegheny Coupling's request to register its mark "because the mark is primarily geographically descriptive of the origin of applicant's goods and/or services."  (Heelan Depo. Ex. 13).  Allegheny Coupling did not respond or object to the USPTO's refusal to register its mark resulting in a declaration by the USPTO that the application for registration had been "abandoned." (USPTO Notice of Abandonment, June 29, 2007).

Allegheny Coupling subsequently requested registration of its mark on the USPTO's Supplemental Register.  The Supplemental Register is for marks comprised of descriptive terms that may be capable of acquiring secondary meaning.  It provides none of the presumptions provided by registration on the Principal Register and does not constitute a determination that a mark is entitled to protection.  See 15 U.S.C. §§ 1091-96.  Allegheny Coupling's application for the Supplemental Register was approved by the USPTO on June 26, 2007.  In approving the request for Supplemental Registration, the USPTO required Allegheny Coupling to disclaim "the generic phrase 'coupling co.'"  (Heelan Depo. Ex. 13).

On March 24, 2006, Plaintiff filed the instant action seeking damages and injunctive relief. Plaintiff's Third Amended Complaint, filed on December 7, 2007, asserts claims for trademark infringement under the Lanham Act, 15 U.S.C. § 1125(a)(1) (Count I), trade dress infringement under the Lanham Act, 15 U.S.C. § 1125(a) (Count II), and various state and common law claims including unjust enrichment and theft of product.  Allegheny Coupling contends that it owns the designs and tooling for those products manufactured by H&H and sold directly to Betts and, therefore, H&H's direct sales of those products to Betts constituted trademark infringement and theft of product:

> Upon information and belief, Betts Industries has, over a period of years, purchased numerous Allegheny products from and in collusion with H & H Metal Specialty Inc. of Jamestown, a job shop for Allegheny (H & H), the result of which has been to defraud Allegheny of its rightful sales income.  Upon information and belief, these products have included Allegheny Marks or trade

3

>>dress configuration, or the Allegheny Marks or trade dress configuration have been deliberately altered or removed.

(Third Amended Complaint, ¶ 13) Following discovery, Plaintiff voluntarily withdrew the trade dress claim. (See Plaintiff's Brief in Opposition, p. 10).

On March 31, 2009, Defendant filed a motion seeking summary judgment as to the remaining trademark infringement and state law claims. On June 12, 2009, Plaintiff filed a brief in opposition. This matter is ripe for review.

## II.  STANDARD FOR REVIEW

Federal Rule of Civil Procedure 56(c)(2) provides that summary judgment shall be granted if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(e) further provides that when a motion for summary judgment is made and supported, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact. See Fed. R. Civ. P. 56(c); Krouse v. American Sterilizer Company, 126 F.3d 494, 500 n.2 (3rd Cir. 1997). The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3rd Cir. 1990). Further, "[R]ule 56 enables a party contending that there is no genuine dispute as to a specific, essential fact 'to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'" Schoch v. First

Fidelity Bancorporation, 912 F.2d 654, 657 (3rd Cir. 1990) (quoting Lujan v. National Wildlife Federation, 497 U.S. 871 (1990)).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Matsushita Elec. Indus. Company v. Zenith Radio Corp., 475 U.S. 574 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3rd Cir. 1989) (the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322; Country Floors, 930 F.2d at 1061.

A material fact is a fact whose resolution will affect the outcome of the case under applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Although the court must resolve any doubts as to the existence of genuine issues of fact against the party moving for summary judgment, Rule 56 "does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegations or suspicions." Firemen's Ins. Company of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3rd Cir. 1982). Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 247-249.

### III. ANALYSIS

Section 43(a)(1)(A) of the Lanham Trademark Act of 1946 ("Lanham Act") provides in relevant part that:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1525(a)(1)(A). "The Lanham Act was intended to make 'actionable the deceptive and misleading use of marks' and 'to protect persons engaged in . . . commerce against unfair competition.'" Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 767-68 (1992) (quoting 11 U.S.C. § 1127).

In order to establish a claim for trademark infringement under the Lanham Act, a plaintiff must prove the following three elements: "(1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services." Ford Motor Co. v. Summit Motor Products, Inc., 930 F.2d 277, 291 (3rd Cir. 1991)(citing Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d 187, 192 (3rd Cir. 1990)).  When a mark is federally registered on the USPTO Principal Register and has become "incontestible,"[2] the ownership, validity, and protectability of the mark are established.  Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 438 (3rd Cir. 2000).  However, where a mark is not registered on the Principal Register,[3] a plaintiff must prove that the mark "is inherently distinctive

---

[2] A mark becomes incontestable after the registrant "files affidavits stating that the mark has been registered, and that it has been in continuous use for five consecutive years subsequent to registration. In addition, the owner must show that there is no proceeding contesting the owner's rights to registration, and that there has been no adverse decision regarding the registrant's ownership or right to registration." Commerce Bancorp, Inc. v. BankAtlantic, 285 F.Supp.2d 475, 484 n. 5 (D.N.J. 2003).

[3] As noted above, Plaintiff's mark was denied registry on the Principal Register. Although the mark was subsequently approved for registration on the Supplemental Register, such registration does not confer any substantive trademark rights and "is not evidence of ownership, validity, or the exclusive

(continued...)

or that it has developed secondary meaning" in order to establish validity and protectability. <u>Colur World, LLC v. SmartHealth, Inc.</u>, 2010 WL 299512 (E.D. Pa. 2010).

To determine whether a mark is inherently distinctive, the court must assign it to one of the following four categories:

> [1] arbitrary (or fanciful) terms, which bear no logical or suggestive relation to the actual characteristics of the goods; [2] suggestive terms, which suggest rather than describe the characteristics of the goods; [3] descriptive terms, which describe a characteristic or ingredient of the article to which it refers[;] and [4] generic terms, which function as the common descriptive name of a product class.

<u>E.T. Browne Drug</u> Co., 538 F.3d at 191 (quoting <u>A.J. Canfield Co. v. Honickman</u>, 808 F.2d 291, 296 (3rd Cir. 1986)) (internal citations and quotation marks omitted). Marks which are determined to be arbitrary, fanciful or suggestive are inherently distinctive and enjoy Lanham Act protection without a showing of secondary meaning. <u>Ford Motor Co.</u>, 930 F.2d at 291 n. 18. In contrast, marks which are merely descriptive must acquire secondary meaning before they are entitled to Lanham Act protection. <u>Id</u>. <u>See</u> <u>also</u> <u>E.T. Browne Drug Co. v. Cococare Products, Inc.</u>, 538 F.3d 185, 199 (3rd Cir. 2008).

Allegheny Coupling concedes that the phrases "Allegheny Coupling," "Allegheny Coupling Co.," and "Allegheny Coupling Company" are geographically descriptive rather than inherently distinctive. <u>See</u> Plaintiff's Brief in Opposition, p. 6; <u>see</u> <u>also</u> USPTO Notice, Defendant's Concise Statement of Material Facts, Ex. 11 (refusing registration of Allegheny Coupling's mark on the basis that they are "primarily geographically descriptive of the origin of applicant's goods and/or services" rather than inherently distinctive). Because the marks at issue are not inherently distinctive, Plaintiff must show that they have acquired distinctiveness through secondary meaning in order to establish that the marks are entitled to protection. <u>See</u> <u>AFL Philadelphia LLC v. Krause</u>, 639 F.Supp.2d 512,

---

$^{3}$(...continued)
right of use . . ." <u>In re Bush Bros. & Co.</u>, 884 F.2d 569, 570 n. 2 (citing J.T. McCarthy, *Trademarks and Unfair Competition*, § 19.8, at 886-88); <u>see</u> <u>also</u> 15 U.S.C. §§ 1091-96.

(E.D. Pa. 2009) (noting that descriptive marks "are treated as protectable marks only upon showing of . . . secondary meaning"); Delaware Valley Financial Group, Inc. v. Principal Life Ins. Co., 640 F.Supp.2d 603, 619 (E.D. Pa. 2009) (finding that "geographical marks" are only capable of being protected if they have "acquired secondary meaning").

"Secondary meaning is a new and additional meaning that attaches to a word or symbol that is not inherently distinctive." E.T. Browne, 538 F.3d at 199 (quoting 2 McCarthy on Trademarks § 15:1). In order to establish secondary meaning, a plaintiff must show that "customers associate [the alleged trademark] with a single, albeit anonymous, commercial source." AcademyOne, inc. v. CollegeSource, Inc., 2009 WL 5184491, *10 (E.D. Pa. 2009) (quoting 2 McCarthy on Trademarks, § 15:1 at 6). As the Third Circuit has explained:

> Secondary meaning exists when the trademark is interpreted by the consuming public to be not only an identification of the product, but also a representation of the product's origin. Secondary meaning is generally established through extensive advertising which creates in the mind of consumers an association between different products bearing the same mark. This association suggests that the products originate from a single source. Once a trademark which could not otherwise have exclusive appropriation achieves secondary meaning, competitors can be prevented from using a similar mark. The purpose of this rule is to minimize confusion of the public as to the origin of the product and to avoid diversion of customers misled by a similar mark.

E.T. Browne, 538 F.3d at 199 (quoting Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1228 (3rd Cir. 1978)).

"Although there are numerous cases determining secondary meaning, there is no consensus on its elements." Ford Motor Co., 930 F.2d at 292 (quoting American Scientific Chemical, Inc. v. American Hospital Supply Corp., 690 F.2d 791, 792 (9th Cir. 1982)). The Third Circuit has enumerated the following non-exclusive list of factors to be considered in determining whether a mark has acquired secondary meaning:

> (1) extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) fact of copying; (5) customer surveys; (6) customer testimony; (7) use of mark in trade

>journals; (9) size of company, (9) number of sales; (10) number of customers; and (11) actual confusion.

See Commerce Nat'l Ins. Servs., 214 F.3d at 438; Tillery v. Leonard & Sciolla, LLP, 521 F.Supp.2d 346, 349 (E.D. Pa. 2007).  When the challenged phrase is "particularly descriptive," such as the geographical mark in this case, the "evidentiary bar" required to show secondary meaning "must be placed somewhat higher."  E.T. Browne, 538 F.3d at 199.

In E.T. Browne, the plaintiff, a manufacturer of personal care products containing cocoa butter, sought trademark protection over the phrase "Cocoa Butter Formula."  Id. at 189.  The district court granted summary judgment in favor of the defendant after concluding that the phrase was generic and, therefore, not protectable as a trademark.  Id.  Although the Third Circuit determined that there was an issue of fact as to whether the phrase "Cocoa Butter Formula" was generic or descriptive, it ultimately concluded that summary judgment was appropriate on the alternative ground that sufficient evidence had not been produced to raise a triable issue of fact as to whether the phrase had acquired a secondary meaning.  Id. at 198.  In that regard, the evidence proffered by the plaintiff included: its use and promotion of the phrase "Cocoa Butter Formula" continuously for 20 years; the substantial amounts of money it had spent promoting the phrase; the nature and quality of the company's advertising efforts in support of the phrase; their competitor's attempts to copy the phrase; and the increased sales of products that were branded with the phrase.  Id. at 199.  After reviewing this evidence, the Court concluded that it was insufficient to raise a genuine issue of fact on the question of secondary meaning:

>The evidence's core deficiency is that while it shows Browne used the term "Cocoa Butter Formula" on many occasions over a long period of time, it does not show Browne succeeded in creating secondary meaning in the minds of consumers. Although the evidence leaves no doubt that Browne hoped the term would acquire secondary meaning, nothing shows that it achieved this goal. Jurors would have to make a leap of faith to conclude that the term gained secondary meaning because the record fails to provide meaningful support. A jury could evaluate the quality of the advertising or consider the rise in product sales, but it would have to guess what lasting impression the advertising left in the

> mind of consumers or what portion of Browne's revenue growth it caused.

Id. at 199. The Court acknowledged that secondary meaning can be inferred, in some instances, from evidence of advertising and sales growth, but indicated that the reasonableness of such an inference would depend upon whether, for example, "[the] term had gained secondary meaning [because] it had appeared for a long period of time in a prevalent advertising campaign" or whether the evidence showed "revenue growth simultaneous with such marketing." Id. at 199-200. The Court further opined that survey evidence of consumer awareness of an alleged mark's secondary meaning, while not required, often constitutes the most persuasive evidence in establishing secondary meaning:

> Browne could have overcome these deficiencies in its evidence by conducting a secondary meaning survey in the same way it conducted its genericness survey. It could have used survey evidence to show that "Cocoa Butter Formula" had acquired secondary meaning in the minds of consumers, thus creating a genuine issue of material fact on that issue. We never have held, and do not hold today, that a party seeking to establish secondary meaning must submit a survey on that point. However, Browne's failure to conduct a secondary meaning survey leaves it without evidence of any sort in this case of the secondary meaning of the term "Cocoa Butter Formula."

Id. at 200-01.

Similarly, in AcademyOne, Inc. v. CollegeSource, the district court granted summary judgment based upon the plaintiff's failure to have produced sufficient evidence of secondary meaning so as to raise a genuine issue of material fact. AcademyOne, 2009 WL 5184491. The plaintiff in AcademyOne owned and operated a website located at the internet domain "collegetransfer.net." When a rival company introduced a competing site utilizing the domain name "collegetransfer.com," plaintiff filed an action under the Lanham Act asserting that "collegetransfer.net" constituted a valid and legally protectable trademark. Id. To support its claim, AcademyOne introduced evidence of specific marketing campaigns, such as purchasing advertising on internet search engines, attendance at conferences, issuance of press releases, and "significant" expenditures on other promotions and marketing. Id. at *11. AcademyOne also introduced

brochures that promoted collegetransfer.net, submitted evidence concerning sales and revenues, and provided evidence that the number of visitors to the website had increased over the course of the two years prior to the alleged infringement.[4] Id. at *12. AcademyOne further argued that the very fact that a competitor attempted to copy its mark was indicative of secondary meaning. Id. at *15. Nonetheless, the court held that AcademyOne had "failed to satisfy its summary judgment burden of pointing to record evidence that creates a genuine issue of material fact as to collegetransfer.net's secondary meaning . . .". Id. In so doing, the Court observed:

> [T]he absence of any direct evidence of [the] mark's alleged secondary meaning is telling. While the evidence of advertising and sales figured conclusively demonstrates that [Plaintiff] "hoped the term would acquire secondary meaning, nothing shows that it achieved that goal."

Id. at *15 (quoting ComponentOne, LLC v. ComponentArt, Inc., 2008 WL 4790661, *12 (W.D. Pa. 2008) (quoting E.T. Browne, 538 F.3d at 199)). The court noted that AcademyOne "[had] not submitted any formal survey evidence designed to demonstrate consumer awareness of collegetransfer.net" and had failed to show that the alleged marketing and sales growth "were in any way connected to consumer recognition" of collegetransfer.net. Id. at *13. See also ComponentOne, 2008 WL 4790661, *12 ("The evidence of ComponentOne's marketing expenditures and sales, while relevant for circumstantially establishing an association in the minds of consumers 'between the mark and the provider of goods and services advertised under the mark,' does not, in the Court's view, demonstrate secondary meaning or commercial strength in and of itself.").

Here, Allegheny Coupling has produced even less evidence in support of its contention that its mark has acquired a secondary meaning than the plaintiffs in E.T. Browne and AcademyOne. Specifically, Allegheny Coupling offers only the declaration of Raymond Heelan, the President and Chairman of Allegheny Coupling, and a transcript of a video prepared by Thomas E. Webber, the

---

[4] More specifically, AcademyOne introduced evidence that "it had revenues of $805,698 in 2007, that 'the web applications at www.collegetransfer.net' received 52,885 visitors in 2007, and that it had fourteen academic institutions and higher education agencies as subscribers . . ." Id. at *12.

president of Oilmen's Truck Tanks, an Allegheny Coupling customer. (See Heelan Declaration, Plaintiff's Ex. B; Webber Declaration and Transcript, Plaintiff's Ex. A). The relevant paragraphs of the Heelan declaration state that:

> 7. Since 1955 Coupling has exclusively and continuously used the names and marks Allegheny Coupling and Allegheny Coupling Co. (the "Coupling Trademark") on its pipe fittings, couplings and various other products.
>
> 8. Coupling has since 1955 been engaged in extensive advertising and sale of its trademarked products to the hazardous liquids handling industry, and is widely recognized within that industry by its trademark.

(Heelan Declaration, Plaintiff's Ex. B, ¶¶ 7-8). With regard to the Webber video, Plaintiff contends that Webber's "candid comments demonstrate that in his mind, the words 'Allegheny Coupling' carry the assurance that the goods which bear that mark have their origin or source in the very company he has come to trust, and from whom he confidently purchases irrespective of its actual geographic location." See Plaintiff's Brief in Opposition, p. 7. I find that Plaintiff's evidence, when considered cumulatively, is insufficient to raise a triable fact as to the existence of secondary meaning.

As to Heelan's declaration, his contention that Plaintiff's mark "is widely recognized within that industry" is conclusory and completely lacking in evidentiary support. See, e.g., Firemen's Ins., 676 F.2d at 969 (noting that Rule 56 does not allow a party resisting summary judgment "to rely merely upon bare assertions, conclusory allegations or suspicions."); see also Gimix, Inc. v. JS & A Group, Inc., 699 F.2d 901, 907-08 (7th Cir. 1983) (holding that an affidavit that alleged that "Auto Page was well-known as a trademark for Gimix' product" was "conclusory in nature and did not adequately place the question of secondary meaning to consumers in issue" and, therefore, did not raise a triable issue as to secondary meaning). Here, Plaintiff has provided no direct evidence in the form of customer surveys, specific marketing campaigns or sales figures utilizing the mark, revenue growth accompanied by advertising, or anything else capable of supporting the reasonable inference that the descriptive phrase "Allegheny Coupling" has acquired secondary meaning. See E.T.

Browne, 538 F.3d at 199 (noting that evidence of advertising and sales using a mark demonstrate only that the user "hoped the term would acquire secondary meaning" rather than that it had done so); Homeowners Group, Inc. v. Home Mktg. Specialists, Inc. 931 F.2d 100, 1008 (6th Cir. 1991) (noting that advertising budgets have only "an attenuated link to actual market recognition"). Although a survey is not required to demonstrate secondary meaning, see E.T. Browne, 538 F.3d at 201, survey evidence "has become a well-recognized means of establishing secondary meaning" and often constitutes "the only direct evidence on this question." See, e.g., Boston Beer Co. L.P. v. Slesar Bros Brewing Co., Inc., 9 F.3d 175, 182-83 (1st Cir. 1993) (discussing the importance of survey evidence in establishing secondary meaning); E.T. Browne, 538 F.3d at 200-01 ("Browne could have overcome [the] deficiencies in its evidence by conducting a secondary meaning survey . . . to show that "Cocoa Butter Formula" had acquired secondary meaning in the minds of consumers . . ."); PaperCutter, Inc. v. Fay's Drug Co., Inc., 900 F.2d 558, 564 (2nd Cir. 1990) (noting the absence of "survey evidence of a representative sample of consumers"); Gimix, 699 F.2d at 907 ("Consumer testimony and consumer surveys are the only direct evidence [of secondary meaning]. . . . The other factors are relevant in a more circumstantial fashion.").

 A review of the Webber video transcript similarly fails to support Plaintiff's proposition that the mark has acquired secondary meaning. Fairly summarized, Webber's testimonial, prepared for advertising use on Allegheny Coupling's website, states only that Plaintiff produces a "good product" and that Plaintiff's fittings are extensively and successfully utilized in the tank truck industry. At no point does Webber opine on the nature of the Allegheny Coupling mark or the strength of that mark in the industry, nor indicate that the word "Allegheny" has acquired a secondary meaning independent of its geographical connotation. (Webber Transcript, Plaintiff's Ex. A, pp. 4-6).

 In sum, I conclude that Plaintiff has failed to meet its burden of producing sufficient evidence to raise a triable issue of fact as to whether the "Allegheny Coupling" mark has acquired

secondary meaning. As such, Plaintiff lacks a protectable trademark interest in the Allegheny Coupling mark and Defendant is entitled to summary judgment.[5]

## IV. CONCLUSION

For the reasons stated herein, Defendant's motion for summary judgment is granted and this action is hereby dismissed. An appropriate order follows.

---

[5] Having dismissed Plaintiff's federal cause of action, I decline to exercise pendent jurisdiction over the remaining state law claims. "[P]endent jurisdiction is a doctrine of discretion, not of plaintiff's right." Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 (1988) (quoting United Mine Workers of America v. Gibbs, 383 U.S. 715, 725-27 (1966)). In general, "if the federal claims are dismissed before trial . . . the state claims should be dismissed as well." Gibbs, 383 U.S. at 726 (acknowledging that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine - judicial economy, convenience, fairness, and comity - will point toward declining to exercise jurisdiction over the remaining state-law claims").

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALLEGHENY COUPLING COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | C.A. No. 06-76 Erie |
| ) | District Judge McLaughlin |
| BETTS INDUSTRIES, INC., ) | |
| ) | |
| Defendant. ) | |

## ORDER

AND NOW, this 18th day of March, 2010, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Defendant Betts Industry's Motion for Summary Judgment is GRANTED and this action is DISMISSED. Judgment is entered in favor of Betts Industries and against Allegheny Coupling as to Allegheny Coupling's Lanham Act claim. The pendent state law claims are dismissed without prejudice.

It is so ORDERED.

/s/ Sean J. McLaughlin
United States District Judge

cm: All parties of record. ___