IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALLEGHENY COUPLING COMPANY, )
)
              Plaintiff, )
  v. )  C.A. No. 06-76 Erie
) District Judge McLaughlin
BETTS INDUSTRIES, INC., )
)
              Defendant. )
)
)

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., J.

This matter is before the Court upon Defendant Betts Industries, Inc.'s Motion for Attorney Fees and Costs Pursuant to 15 U.S.C. §1117(a)(3). An evidentiary hearing on Betts' Motion was held on November 18, 2010 and December 15 and 16, 2010 ("Evidentiary Hearing"). The following constitute the Court's Findings of Fact and Conclusions of Law.

**I. FINDINGS OF FACT**

**A. Background**

1. Allegheny Coupling ("Allegheny"), founded in 1955, markets and sells industrial couplings and fittings. (Deposition of Raymond V. Heelan ("Heelan Depo."), p. 40).

2. Betts Industries ("Betts"), founded in 1901, was originally a foundry and job shop and eventually grew to become a manufacturer of its own proprietary products for the highway cargo tank industry. (Affidavit of Rodney E. Betts, ¶¶ 3-6).

1

3. On March 24, 2006, Allegheny commenced the instant action against Betts alleging, *inter alia*, trademark and trade dress infringement in violation of the Lanham Trademark Act, 15 U.S.C. §1051 et seq ("Lanham Act") and seeking a declaratory judgment as to the ownership of certain equipment, dies and molds which both parties claimed to legally own. (See Doc. 1, Complaint). Allegheny subsequently filed three separate amended complaints, each of which contained claims of trademark and trade dress infringement. (See Doc. 4, Amended Complaint; Doc. 32, Second Amended Complaint; Doc. 45, Third Amended Complaint).

### B. Allegheny's Trade Dress Claim

4. In Count II of the Third Amended Complaint, Allegheny asserted a claim for trade dress infringement relative to Allegheny's "coupling and fitting products." (Doc. 45, Third Amended Complaint, ¶ 32-34). Specifically, Allegheny alleged that its "coupling and fitting products have a consistent total image and overall appearance featuring size, shape, color and texture characteristics" which constitute "a valid and protectable trade dress configuration." (Id. at ¶¶ 32-33). Allegheny also alleged that its trade dress was "non-functional and distinctive." (Id. at ¶ 35).

5. Throughout the discovery stage of this litigation, the parties frequently clashed over the broad nature of Allegheny's discovery requests. In response to a motion from Betts seeking clarification as to which products formed the basis for Allegheny's trademark and trade dress infringement claims, the Court ordered Allegheny to supply a list identifying the specific products that formed the basis of those claims. (Betts Ex. 4, Transcript of Hearing on 2/13/08, pp. 5-6).

6. On March 3, 2008, Allegheny served Betts with a list containing 2,267 products that it claimed were subject to trademark and/or trade dress protection and sought extensive

discovery relative to those items. (Betts Ex. 1, Product List; Transcript of Evidentiary Hearing, 11/18/10, pp. 88-91).[1] The product list contained a wide variety of parts including pipes, pipe fittings, strainers, gaskets, hex nuts, flanges, valves and aluminum clips. (Id.) Allegheny President Raymond Heelan ("Heelan") and former Chief Executive Officer Jamie Sitler ("Sitler") each participated in generating the initial list of 2,267 products. (Trans. 11/18/10, p. 55; Trans. 12/15/10, pp. 60-67).

7. On June 9, 2008, in response to a Motion for a Protective Order filed by Betts, the Court directed Allegheny to "delineate specifically and with sufficient detail" which of those 2,267 parts formed the basis for Allegheny's trademark and trade dress infringement claims. (Betts Ex. 5, Transcript of Hearing on 6/9/10, p. 49).

8. In response to the Court's Order of June 9, 2010, Allegheny produced a thirty-five page list containing approximately 2,110 parts that it contended were subject to either trademark or trade dress protection. (Betts Ex. 2; Trans. 11/18/10, pp. 66-70). Included in the list were parts such as pipes, pipe fittings, strainers, gaskets, hex nuts, flanges, valves and aluminum clips. (Id.). Next to approximately 2,065 of the 2,110 listed parts, Allegheny marked an "x" to indicate that the part was subject to a claim of trade dress infringement. (Id.). Heelan and Allegheny Vice-President and Secretary Cairn Bishop ("Bishop") each participated in generating this list. (Trans. 11/18/10, p. 55; Trans. 12/15/10, pp. 60-67).

9. On August 1, 2008, Betts deposed Allegheny's designated Rule 30(b)(6) representative, Jamie Sitler. At that time, Sitler served as Allegheny's Chief Executive Officer. (Betts Ex. 7, Sitler Depo., p. 7).

10. Sitler identified the purported trade dress of Allegheny's pipe products as "the weld seam" and the "bells" or "belled ends" of certain pipe fittings:

---

[1] Hereinafter, references to the Evidentiary Hearing transcript will utilize the following format: ("Trans. XX/XX/10, p. X).

> The trade dress configuration is really a compilation of both the bells, which are unique, and also the seam which you can clearly see. And that is the recognizable feature of those fittings.

(Betts Ex. 7, Sitler Depo., p. 72).

11. Sitler used a 90-degree metal elbow tube with a 6 inch radius to physically demonstrate the welded seam and belled end that Allegheny claimed as trade dress. (Betts Ex. 7, Sitler Depo., p. 72).

12. Sitler admitted that the seam weld and belled edge of the elbow pipe are both functional. He explained that the function of the seam weld is to join together the two pieces of metal that constitute the complete elbow and that the function of the bell is to allow another tube to slide into the belled end so that both tubes can be joined. (Betts Ex. 7, Sitler Depo., p. 73-74). Without the weld or the bell, the product would not work. (Id. at 73-74).

13. Although Allegheny asserts that the welded seam on the 6 inch tube was a critical element of the product's trade dress, Allegheny began producing an otherwise identical product without the welded seam in or around 2004 because the seamless product was more "state of the art" and represented the direction that the industry was heading. (Betts Ex. 7, Sitler Depo., pp. 87-88).

14. Sitler also attempted to demonstrate the features of a "four-inch diameter flued flange" that Allegheny claimed as trade dress. Sitler asserted that the trade dress of that item was the "flued edge" of the flange. (Betts Ex. 7, Sitler Depo., p. 81).

15. Sitler admitted that the flued edge of the flange is entirely functional in that its purpose was to "strengthen" the flange and to make it easier to attach the flange to another product. (Betts Ex. 7, Sitler Depo., p. 82).

16. Upon inspection, Sitler could not identify any trade dress features of a "3-inch diameter aluminum flange" despite that product appearing on the list of products over which Allegheny asserted trade dress protection. (Betts Ex. 7, Sitler Depo., pp. 88-89).

17. Allegheny never identified any trade dress features for many of the thousands of products that Allegheny claimed were subject to trade dress protection. For example, Allegheny provided no evidence that any of its hex nuts, strainers, gaskets, or aluminum clips had an identifiable trade dress.

18. Many of Allegheny's responses, when pressed to identify the trade dress of a specific part or item, were patently frivolous. For example, Heelan stated that the trade dress of a particular 4-inch aluminum flange was the fact that the outer dimensions of the flange failed to meet industry standard specifications. (Trans. 11/18/10, pp. 72-73). Despite his identification of that feature as the product's trade dress, Heelan indicated that the company was working to improve the manufacturing process so that the flange would meet specifications in the future. (Trans. 11/18/10, pp. 75). Heelan conceded that the flange's deviation from industry standard dimensions was not noticeable unless someone measured the flange. (Trans. 11/18/10, p. 74).

19. Neither Heelan nor Bishop could identify a common or unifying trade dress for the hundreds of parts identified by Allegheny as subject to trade dress protection. (Trans. 11/18/10, pp. 64-73; Trans. 12/15/10, pp. 63-66).

20. Many of the parts that Allegheny claimed were subject to trade dress protection were fundamentally generic. For example, the list of parts over which Allegheny asserted trade dress protection included a "3/8-16 hex nut." A hex nut is a common, generic piece of hardware that connects to a bolt and is widely available at any hardware store. (Trans. 11/18/10, pp. 124-25; Betts Ex. 39, Hex Nuts).

21. Allegheny also attempted to assert a trade dress infringement claim over a series of chemical hydraulic valves despite that Betts was the owner of a valid patent for those valves. (Trans. 11/18/10, p. 128).

22. On March 9, 2009, counsel for Betts sent a letter to Allegheny requesting that Allegheny withdraw its trade dress claim. The letter detailed the functional nature of the few features

identified by Allegheny as trade dress and referenced Sitler's admission that each of the purported trade dress features of Allegheny's products was entirely functional. (Betts Ex. 11, Letter from Counsel). Allegheny refused to withdraw the claim.

23. Thereafter, on March 31, 2009, Betts filed a Motion for Summary Judgment. (Doc. 76, Motion for Summary Judgment). The summary judgment motion raised the same deficiencies in Allegheny's trade dress claim that counsel for Betts had identified in the March 9, 2009 letter.

24. Allegheny responded to Betts' summary judgment motion by withdrawing the trade dress infringement claim without explanation. (Doc. 85, Brief in Opposition to Summary Judgment).

25. Prior to the withdrawal of Allegheny's trade dress claim, Betts' personnel had invested in excess of one hundred hours in responding to discovery requests concerning the extensive list of items over which Allegheny asserted trade dress infringement. (Trans. 11/18/10, pp. 107-112).

### C. Allegheny's Trademark Infringement Claim

26. In addition to claiming trade dress protection, each of Allegheny's amended complaints also contained a claim for trademark infringement with respect to the phrases "Allegheny Coupling," "Allegheny Coupling Co." and "Allegheny & Design." (Doc. 45, Third Amended Complaint).

27. On May 10, 2005, Allegheny, through counsel, filed an application with the United States Patent and Trademark Office ("USPTO") seeking to have its mark "Allegheny plus design," Serial No. 78/626,230, placed on the USPTO Principal Register. (Betts Ex. 15, Application for Registration on Principal Register).

28. On March 23, 2006, Allegheny filed three additional applications through counsel to have each of the following trademarks placed on the USPTO Principal Register:

"Allegheny," Serial No. 78/844,533

"Allegheny Coupling Co.," Serial No. 78/844,576

"Allegheny Coupling," Serial No. 78/844,602

(Betts Ex. 12, 13, 14, Applications for Registration on Principal Register). Each trademark application was signed by Heelan as president of Allegheny. (Id.).

29. On July 10, 2006, the USPTO issued an official "Office Action" wherein it notified Allegheny that the "Allegheny plus design" mark had been denied registration on the Principal Register because "the mark is primarily geographically descriptive of the origin of applicant's goods and/or services." Trademark Act Section 2(e)(2), 15 U.S.C. §1052(e)(2)." (Betts Ex. 8, USPTO Office Action).

30. On September 7, 2006, the USPTO issued three official Office Actions notifying Allegheny that the "Allegheny," "Allegheny Coupling Co.," and "Allegheny Coupling" marks had each been denied registration on the Principal Register because each mark "is primarily geographically descriptive of the origin of applicant's goods and/or services." Trademark Act Section 2(e)(2), 15 U.S.C. §1052(e)(2)." (Betts Ex. 19, USPTO Office Actions).

31. By letter dated January 15, 2007, Attorney Philip Foret forwarded each of the September 7, 2006 Office Actions to Heelan and explained that the marks had been denied registration and that a response would be due on or before March 8, 2007. (Betts Ex. 20, Letter from Foret).

32. Another attorney engaged by Allegheny to secure registration of the marks, Wayne Lovercheck, also wrote to Heelan to inform him that the USPTO had denied registration of the Allegheny marks. (Betts Ex. 16, Letter from Lovercheck). On January 4th and 5th, 2007, Attorney Lovercheck and Heelan spoke on the telephone several times to discuss the

USPTO's refusal to register the Allegheny marks. (Betts Ex. 21, Lovercheck Invoice, p. 11).

33. On January 5, 2007, Heelan faxed a letter to another attorney with the December 5, 2006 letter from Attorney Lovercheck attached and explained that it was an "important matter" related to securing registration of the Allegheny marks. (Betts Ex. 17, Heelan Fax).

34. On January 12, 2007, Attorney Foret faxed a copy of Allegheny's response to the USPTO to Heelan. (Betts Ex. 15, Foret Fax).

35. On June 12, 2007, the USPTO approved the mark "Allegheny" for registration on the Supplemental Register. The USPTO approved the mark "Allegheny Coupling Co." for registration on the Supplemental Register on June 26, 2007. The USPTO approved the mark "Allegheny Coupling Company" for registration on the Supplemental Register on July 17, 2007. (Betts Ex. 21, "Trademark File").

36. When a mark has been federally registered on the USPTO Principal Register, there is a rebuttable presumption of validity and ownership of the mark. 15 U.S.C. § 1057(b). In contrast, registration on the USPTO Supplemental Register confers no substantive trademark rights. See 15 U.S.C. §§ 1091-96.

37. On June 25, 2008, Betts served a Request for Production of Documents (Second Set) upon Allegheny seeking:

> (a) All documents memorializing or relating to any efforts by you to register any trademarks that appear on any one or more of the products listed in your Product List.
>
> (b) All documents or tangible things submitted by you to the United States Patent and Trademark Office regarding any alleged trademark that appears on any one or more products listed in your Product List or any request for registration of any alleged trademark appearing on any one or more such products.
>
> (c) All documents or tangible things received by you from the United States Patent and Trademark Office in response to any application or claim to trademark protection relative to any one or more of the products in your Product List.

(Betts Ex. 24, Request for Documents).

38. Following an initial objection, counsel for Allegheny responded by sending an email wherein he represented that he was "attaching copies of the entirety of Allegheny's Trademark file." (Betts Ex. 25).

39. The file attached to counsel's email consisted of thirty-two pages of documents. Specifically, the file contained the following documents in the following order:

- March 24, 2006 letter from Attorney Foret to Heelan indicating that applications to place the "Allegheny," "Allegheny Coupling Co," and "Allegheny Coupling" marks on the USPTO Principal Register had been filed. (Betts Ex. 25, p. 3).

- USPTO Acknowledgement of Application forms dated March 23, 2006 indicating that applications for placement on the Principal Register had been successfully filed for the "Allegheny," "Allegheny Coupling Co," and "Allegheny Coupling" marks. (Betts Ex. 25, pp. 4-12).

- March 21, 2006 letter from Attorney Foret to Heelan indicating that the applications for registration of the "Allegheny," "Allegheny Coupling Co," and "Allegheny Coupling" marks on the Principal Register were ready for signature. (Betts Ex. 25, p. 13).

- Executed copies of the applications to place the "Allegheny," "Allegheny Coupling Co," and "Allegheny Coupling" marks on the Principal Register. (Betts Ex. 25, pp. 14-21, 23).

- June 18, 2007 letter from Attorney Lovercheck to Heelan advising Heelan that the "Allegheny" mark had been successfully registered. (Betts Ex. 25, p. 22).

- USPTO Certificate of Registration of "Allegheny" on the Supplemental Register. (Betts Ex. 25, pp. 24-26).

- July 25, 2007 letter from Attorney Lovercheck to Heelan advising Heelan that the "Allegheny Coupling Company" mark had been successfully registered. (Betts Ex. 25, p. 27).

- USPTO Certificate of Registration of "Allegheny Coupling Company" on the Supplemental Register. (Betts Ex. 25, pp. ).

- July 2, 2007 letter from Attorney Lovercheck to Heelan advising Heelan that the "Allegheny Coupling Co." mark had been successfully registered. (Betts Ex. 25, p. 31).

- USPTO Certificate of Registration of "Allegheny Coupling Co." on the Supplemental Register. (Betts Ex. 25, pp. 32-34).

40. The file forwarded to Betts by counsel for Allegheny did not contain any documents reflective of the fact that Allegheny's applications for registration on the Principal Register had been rejected by the USPTO on the basis of the geographical descriptiveness of the Allegheny marks. (Betts Ex. 25).

41. I find that the following documents were in the possession, custody or control of Heelan and Bishop but were not produced as part of the trademark file:

    - September 7, 2006 notices of official USPTO Office Action denying registration of the "Allegheny," "Allegheny Coupling Co," and "Allegheny Coupling" marks on the Principal Register on the grounds that the marks are geographically descriptive. (Betts. Ex. 19).

    - July 10, 2006 notice of official USPTO Office Action denying registration of the "Allegheny and design" mark on the Principal Register on the ground that the mark was geographically descriptive.

    - January 15, 2007 letter from Attorney Foret to Heelan indicating that the "Allegheny," "Allegheny Coupling Co," and "Allegheny Coupling" marks had been refused registration on the grounds that the marks were geographically descriptive and enclosing copies of the Office Actions. (Betts Ex. 20).

    - Responses and Requests for Reconsideration filed by Allegheny with respect to the failed applications for registration of the "Allegheny," "Allegheny Coupling Co," and "Allegheny Coupling" marks on the Principal Register.

    - December 5, 2006 letter from Attorney Lovercheck to Heelan indicating that the "Allegheny," "Allegheny Coupling Co," and "Allegheny Coupling" marks had been refused registration. (Betts Ex. 16).

42. Following this Court's order granting summary judgment, Betts, via a subpoena, obtained many of the missing documents described above from the law firm that had represented Allegheny in their attempt to register the "Allegheny," "Allegheny Coupling Co," and "Allegheny Coupling" marks. (Trans. 12/15/10, pp. 88-90).

43. Neither Heelan nor Bishop could offer a credible explanation as to why the trademark file that they produced during discovery omitted all of the documents and correspondence that

referenced the geographically descriptive nature of Allegheny's marks and the USPTO's denial of registration on that basis. (Trans. 11/18/10, pp. 39-54; Trans. 12/15/10, pp. 44-51).

44. I find that Bishop's suggestion that the documents may have been stolen or removed from the file by a disgruntled employee is completely lacking in any evidentiary support. (Trans. 12/16/10, pp. 83-94).

45. I find that Allegheny's failure to have turned over the documents that were missing from the trademark file was purposeful, rather than inadvertent.

46. On March 18, 2010, this Court granted summary judgment in favor of Betts as to Allegheny's trademark infringement claim on the basis that Allegheny's asserted trademarks were primarily geographically descriptive and, as such, were only subject to protection upon proof that they had acquired secondary meaning. I further held that Allegheny had failed to supply sufficient evidence to raise a triable issue of fact as to the existence of secondary meaning. (Doc. 86, Memorandum Opinion and Order).

## II. CONCLUSIONS OF LAW

Section 35(a) of the Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. §1117(a)(3). The "language of § 35(a) authorizing attorney's fees to the prevailing party in the discretion of the court is the same for defendants as well as plaintiffs." Securacomm Consulting, Inc. v. Securacom, Inc., 224 F.3d 273, 280 (3rd Cir. 2000).

Determining whether a case is "exceptional" requires the district court to first consider whether the losing party "engaged in any culpable conduct." Green v. Fornario, 486 F.3d 100, 103 (3rd Cir. 2007). "[C]ulpable conduct comes in a variety of forms and may vary depending on the circumstances of a particular case." Securacom, 224 F.3d at 280. Typical examples of culpable conduct include, but are not limited to, "bad faith, fraud, malice, and knowing infringement." Id.

(citing Securacom, 224 F.3d at 280. When the prevailing party in a trademark infringement case is the defendant, "the plaintiff's culpable conduct will necessarily center on the act of filing the lawsuit rather than on the infringement." Securacom, 224 F.3d at 280. In addition, the court should consider "the way the losing party handled himself during the ligitation." Green, 486 F.3d at 103; Securacom, 224 F.3d at 280.

If the court finds culpable conduct, it next "must decide whether the circumstances are 'exceptional' enough to warrant a fee award." Green, 486 F.3d at 103. Factors to consider in determining whether a case is "exceptional" include whether the plaintiff's pursuit of a claim was "unjustified, groundless, or frivolous" and whether "the plaintiff's subjective conduct throughout the litigation" was "vexatious or involving other misconduct." J&J Snack Foods, Corp. v. Earthgrains, 2003 WL 21051711, *3 (D.N.J. 2003) (internal footnotes omitted). Vexatious misconduct includes litigation techniques that are "oppressive and harassing" or which unreasonably increase the costs of litigation. S. Industries, Inc. v. Centra 2000, Inc., 249 F.3d 625, 626 (7th Cir. 2001) (affirming fee award where plaintiff pursued a trademark infringement claim for four years without producing evidence of a single infringing sale of merchandise). Unjustified and groundless claims include those which have no legal basis or lack merit. Cairns v. Franklin Mint Co., 292 F.3d 1139, 1156 (9th Cir. 2002) (affirming fee award when trademark claim was "groundless and unreasonable because it had no legal basis"); Yankee Candle Co. v. Bridgewater Candle Co., 140 F.Supp.2d 111, 121-22 (D. Mass. 2001) (awarding fees after considering plaintiff's "aggressive pursuit of unfounded claims"). Moreover, a suit that is "initially brought with good reason and in good faith" may become "'exceptional' enough to warrant an award of attorney's fees" if the litigant continues to pursue the claim once it becomes clear that there is no evidence to support it. Earthgrains, 2003 WL 21051711, *4; Proctor & Gamble Co. v. Amway Corp., 280 F.3d 519, 531 (5th Cir. 2002).

District courts have not hesitated to award attorney fees under the Lanham Act when a defendant is forced to defend against a frivolous trade dress claim. For example, in Ferraris Medical,

Inc. v. Azimuth Corporation, 2002 WL 1728225, *2 (D. N.H. 2002), the court awarded attorney fees after concluding that "Plaintiff's suit was oppressive in that its Lanham Act claims were completely lacking in merit, to the point of being frivolous." The court stated:

> As to its trade dress claims, Ferraris knew it had to prove both non-functionality and acquisition of secondary meaning in order to prevail, yet it offered no evidence of non-functionality, and even failed to convey any reasonable basis for thinking its harness design was anything but functional.

Id. Similarly, in Vital Pharmaceuticals, Inc. v. American Body Building Products, LLC, the district court held that a fee award was warranted because the plaintiff "could not satisfy even one of the elements of a valid trade dress claim, and its case suffered from severe credibility problems and a lack of convincing evidence." The court observed:

> The features of the Redline bottle that Plaintiff claimed as its protected trade dress were very limited, namely its smooth, cylindrical bottle design and neck with vertical lettering of the product name. This trade dress was not inherently distinctive, and despite the fact that courts have held survey evidence to be the most persuasive in establishing secondary meaning, Plaintiff intentionally chose not to present survey evidence.
>
> \* \* \* \* \* \* \*
>
> Plaintiff's trade dress, aside from the functional element of vertical lettering, was nothing more than a bottle with a neck on it, a purely functional design.

American Body Building, 510 F.Supp.2d 1043, 1049-51 (S.D. Fla. 2007). See also Bretford Manufacturing, Inc. v. Smith System Manufacturing Company, 389 F.Supp.2d 983, 986 (N.D. Ill. 2005) (awarding attorney fees to defendant after plaintiff failed to produce any evidence as to a necessary element of its trade dress claim).

Here, Allegheny's filing and continued pursuit of its trade dress claim was patently frivolous and groundless. The Lanham Act requires that a party asserting a trade dress infringement claim must demonstrate that the features or characteristics upon which the claim is based are "non-functional." 15 U.S.C. §1125(a)(3). Nonetheless, Allegheny asserted trade dress protection for parts that were fundamentally generic and whose product features were indisputably functional.

In addition, despite the utter lack of merit of its trade dress claim, Allegheny served voluminous discovery on Betts concerning hundreds of parts and products over which it asserted trade dress protection. Numerous hours were spent by Betts personnel attempting to supply discovery responses relative to a trade dress claim that was legally dead on arrival. While it is not unusual for parties to push the discovery "envelope" in attempting to secure information from an opponent, the conduct here, in my view, is qualitatively different. It represents the type of "oppressive and harassing" conduct that lends further support to an award of attorney fees. See, e.g., Finance Inv. Co. v. Geberit AG, 165 F.3d 526, 533-34 (7th Cir. 1998) (affirming award of attorney fees to defendant who was forced to endure "oppressive" litigation "including protracted discovery disputes" in a meritless action).

Finally, Allegheny's intentional failure to have turned over any documentation relative to its failed attempt to register the "Allegheny," "Allegheny Coupling Co," and "Allegheny Coupling" marks on the Principal Register is further evidence of the culpable and abusive conduct engaged in by the plaintiff in this litigation. See Centra, 249 F.3d at 627 (affirming an award of fees where plaintiff failed to properly respond to discovery requests); Beckman Instruments, Inc. v. LKB Produkter AB, 892 F.2d 1547, 1551-52 (Fed. Cir. 1989) (affirming an award of fees against a party who engaged in "various discovery . . . abuses") (cited with approval by Securacom, 224 F.3d at 281-82).

### III. CONCLUSION

Based upon the foregoing Findings of Fact and Conclusions of Law, and pursuant to Section 35(a) of the Lanham Act, I find by clear and convincing evidence that the Plaintiff's previously described culpable conduct, when viewed *in toto*, makes this the rare "exceptional" case which supports an award of attorney fees.[2] Consequently, Defendant's Motion for Attorney Fees is granted.

---

[2] The Third Circuit Court of Appeals has not addressed the issue of whether a

continue...

A hearing will be set to determine the amount of the attorney fee award at the convenience of the parties.

---

[2]...continue
party must establish that a case is "exceptional" by clear and convincing evidence in order to succeed on a claim for attorney fees. See U.S. Olympic Committee v. Tobyhanna Camp Corp., 2010 WL 4617429, *6 n. 4 (M.D. Pa. 2010). However, other courts have so held. See, e.g., CJC Holdings, Inc. v. Wright & Lato, Inc., 979 F.2d 60, 65 (5th Cir.1992) ("[W]e agree with the Federal Circuit that the prevailing party must demonstrate the exceptional nature of a case by clear and convincing evidence before a district court should decide whether to make the award."); U.S. Olympic, 2010 WL 4617429, *6. I have applied the clear and convincing standard in resolving Betts' motion.

## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALLEGHENY COUPLING COMPANY, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> BETTS INDUSTRIES, INC., ) <br> ) <br> Defendant. ) <br> ) <br> ) | C.A. No. 06-76 Erie <br> District Judge McLaughlin |

## ORDER

AND NOW, this 31st day of March, 2011, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Defendant Betts Industry's Motion for Attorney Fees and Costs Pursuant to 15 U.S.C. §1117(a)(3) is GRANTED.

It is so ORDERED.

/s/ Sean J. McLaughlin
United States District Judge

cm: All parties of record. ___